OPINION OF THE COURT
Alice Schlesinger, J.
Before the court is round two of the ongoing dispute between the City of New York and the Learning Annex over the latter’s use of bins to distribute its publication. At the heart of the controversy is whether the magazine is commercial or noncommercial speech and whether a city regulation banning *792 distribution of commercial speech through bins on sidewalks is constitutional.
The Learning Annex offers short courses on a wide variety of subjects ranging from Astrology to Computers. The defendants publish the Learning Annex which describes the various courses and also contains articles of a general nature. The publication is distributed to the public free of charge via news racks or bins located on the city’s sidewalks.
In order to receive the city’s permission to use bins the Learning Annex in 1984 submitted two copies of its publication. The copies contained a description of the courses, the fees, and the location of the course. The publication’s advertisements related only to the Learning Annex. The city denied permission to use bins on the ground that the publication was mere advertisement.
Thereafter, in 1985 the Learning Annex submitted another publication that had been modified. This version, in addition to describing the course listings, contained articles, including short stories, a review and recipes, and unrelated commercial advertising. The city did not responded to this effort and the Learning Annex began placing its news racks on the sidewalks.
In 1985, the City of New York attempted to permanently enjoin the Learning Annex from distributing the magazine via the bins. These efforts proved unsuccessful.
The Supreme Court (Bowman, J.) ruled that the Learning Annex magazine was commercial speech (City of New York v American School Publs.).[1] It characterized the revised publication as an attempt to transform an advertisement into noncommercial speech. Nonetheless, it denied the city’s motion for a preliminary injunction on the ground that city could not interfere with distribution of the publication through bins without a narrowly drawn statute regulating defendants’ actions.
The Appellate Division (119 AD2d 13, 18-19 [1st Dept 1986]) modified the lower court to the extent of holding that the publication although containing elements of commercial speech was entitled to full noncommercial speech protection and found that the modified publication was not a sham.
The Appellate Division also agreed with the Supreme Court *793 that the city could not prevent the distribution of the publication without statutory or regulatory authority.
The Court of Appeals (69 NY2d 576) noted the disagreement between the two courts on whether the publication was commercial or noncommercial speech but declined to rule on this issue. Instead it affirmed on the ground that the city could not interfere with the Learning Annex’s First Amendment rights without benefit of an appropriately drawn regulation.
In April 1988, the city promulgated a regulation effective July 3, 1988 which prohibits installation of bins on sidewalks for the purpose of distributing materials deemed to be commercial speech. The regulation, section 2.5-a of the Highway Rules and Regulations, provides in relevant part that: "No person or entity may place, install or maintain any structure, whether free-standing or affixed to street furniture, upon, in or on any portion of a public highway where that structure is used, or is intended to be used, for the purpose of distributing commercial speech” (§ 2.5-a.l [b]).
The regulation defines commercial speech in the following manner:
"Commercial speech means written materials which proposes a commercial transaction, refers to a specific product or service, or to specific products or services, and which is published for the purpose of promoting those products or services, notwithstanding the fact that the material may contain a discussion of public issues * * *.
"The Commissioner of the Department of Transportation, in consultation with the Corporation, shall determine whether a publication constitutes commercial speech. That determination will be made in accordance with and following the decisions of the United States Supreme Court and the New York State Court of Appeals” (§ 2.5-a.l [a] [4]; [c]).
In July 1988 the city reviewed the August 1988 issue of the Learning Annex and determined that it constituted commercial speech. A violation, dated August 5, 1988, was issued directing the Learning Annex to remove its bins within five days.
Pursuant to the regulation, the defendants requested a meeting with city officials to discuss the violation notice. At the meeting defendants sought guidance in order to achieve compliance with the regulations pertaining to installation of sidewalk bins. The city refused to help the Learning Annex *794 apparently believing that this would subvert the city’s policy regulating use of public streets.
Thereafter, in 1989 the city commenced the instant action seeking removal of the bins, to permanently enjoin the Learning Annex from installing devices on sidewalks for the distribution and display of the publication, and for damages. The Learning Annex counterclaimed for damages as well.
The Learning Annex has moved for summary judgment. It contends, pointing to the Appellate Division’s holding in round one, that the publication is noncommercial speech and is entitled to protection under the First Amendment. Second, it asserts that section 2.5-a of the Highway Rules and Regulations (the regulation) is unconstitutional.
The city in support of its cross motion for summary judgment contends that the Learning Annex is commercial speech. Second, it asserts that the regulation is constitutional. The regulation serves a substantial interest. It promotes pedestrian and vehicular safety, and preserves the aesthetics of the sidewalks. Further, the city argues that the regulation of bins used to dispense commercial speech is a reasonable means to accomplish those ends.
The United States Supreme Court defines commercial speech as expression that "does 'no more than propose a commercial transaction’ ”.[2] (Virginia Pharmacy Bd. v Virginia Consumer Council, 425 US 748, 762 [1976], quoting Pittsburgh Press Co. v Human Relations Commn., 413 US 376, 385 [1973].)
In Bolger v Youngs Drug Prods. Corp. (463 US 60, 66-69 [1983]) the court held that a condom manufacturer’s unsolicited mailings constituted commercial speech notwithstanding the fact that the pamphlets contained discussions of important public issues relating to venereal disease and family planning.
Justice Marshall discussed a number of considerations relevant to this determination. The fact that the publication is an advertisement does not necessarily mean that it is commercial speech. Nor does reference to a particular product turn the expression into commercial speech. Further, the fact there is *795 an economic motivation does not turn the material into commercial speech.
However, a combination of all three of those factors would probably compel a finding of commercial speech as was the finding in the earlier case in Bolger (supra).
As noted earlier, the Appellate Division, in the earlier case in an unanimous opinion in 1986, found that under the strict standard established by the Supreme Court the "defendants’ magazine falls clearly within the fully protected noncommercial category” (119 AD2d, supra, at 19).
This result was reached because the court found the magazine, in addition to providing course listings for the school and advertising for products other than defendants’, also contained considerable informational material on a variety of subjects. It also noted that these articles failed to advertise or mention defendants’ courses.
I find, that after examining the submitted issue of August 1988, that a similar conclusion must be obtained.
This publication first of all contains a table of contents which lists features and articles not related to course listings or the Learning Annex itself. Here there are six.
The first is entitled, "Resumes That Get Results”. Its author is given and the article is copyrighted. It covers parts of four pages and besides giving 10 distinct points for putting together an effective resumé, concludes by explaining "How To Write A Cover Letter That Works”. Finally, it does not advertise any of defendant’s courses or even mention its name.
The second article, also bylined, is one entitled, "Wine Avenger”. It contains hints at preserving open bottles of wine and a letter addressed to "Mr. Avenger”. Mr. Avenger informs his readers, in a bit of whimsy, that "published letters will receive a bottle of champagne and unpublished letters will be burned.”
What follows is a long, well-researched article entitled, "Which Music Helps Your Muscles”, on the positive effect music can have on one’s physical well-being. It is written by an author, readers are told, who has covered "athletic performance for Esquire, GQ and other national magazines.”
This same author then writes an article on how "Gossip May be Good For You”.
Finally, there appear reviews of rock and roll music and *796 current movies. None of the articles mention courses advertised elsewhere in the magazine or the Learning Annex itself.
Therefore, despite the fact that the primary purpose of the publication is to showcase courses offered by the defendant for its profit, it cannot be said that it does no more than propose a commercial transaction.
I feel it is incumbent on this court to discuss the second major issue in this case, the constitutionality of the city’s regulation, despite the above finding which would remove the magazine from the regulation’s grasp.
The Court of Appeals, in affirming the Appellate Division decision, did so on that case’s second issue; whether the city could legally preclude defendant from distributing its magazine in street bins in the absence of duly enacted guidelines or procedures. That court decided it could not without a "properly drawn regulation synchronizing the City’s right to maintain health and safety with First Amendment speech and press freedoms” (69 NY2d, supra, at 581).
In discussing how such a regulation could pass constitutional muster, the court cited Matter of von Wiegen (63 NY2d 163 [1984]) for the proposition that the regulation cannot offend the "content neutrality” requirement. (Supra, at 583.)
Matter of yon Wiegen (supra) concerned a lawyer disciplinary proceeding where there had been contrary lower findings as to whether the appellant had violated sections of the Judiciary Law and the Code of Professional Responsibility by, among other things, engaging in direct mail solicitation of victims of a hotel disaster in Kansas City.
The Appellate Division found that he had and that a prohibition on direct mail solicitation of accident victims constituted only a restriction on the time, place and manner of speech, which is permitted rather than its content, which is not.
It is to be noted that there was no issue whether or not these solicitations were commercial in nature. They clearly were.
The Court of Appeals, in adopting the four-part analysis established by the United States Supreme Court in Central Hudson Gas & Elec. v Public Serv. Commn. (447 US 557 [1980]), disagreed. It struck down the restriction finding that it was not related to time, place and manner of expression but was content-based.
In Central Hudson (supra) Justice Powell first discussed the *797 First Amendment’s concern for commercial speech because it provides an informational function to the public.
Under this test, assuming the communication is neither misleading nor related to unlawful activity, the government must assert a substantial interest to be achieved by restricting that communication. If this is the case, the technique of regulation must be in proportion to the interest. Finally "[t]he limitation on expression must be designed carefully to achieve the State’s goal.”[3] (Supra, at 564.)
In Central Hudson (supra) the court found that the Public Service Commission’s complete ban on promotional advertising by the defendant utility company could not be justified consistent with the First Amendment. Nor could the State show that a more limited restriction on the content of promotional advertising would not adequately serve the State’s interest.
Similarly, in Matter of von Wiegen (supra, at 171) the New York Court of Appeals found that the protection afforded to commercial speech by the First Amendment "requires the courts to eschew blanket prohibitions of solicitation and to access the validity of the regulation by carefully balancing the First Amendment interest at stake with the public interest allegedly served by the regulation”.
The yon Wiegen court held that the mailings were not inherently misleading and that the State had an interest in justifying the regulation. However, there was a less drastic alternative to an absolute ban which could balance the State’s interest with the "public’s interest in receiving information” (supra, at 175).
In the instant matter, the regulation here is clearly content-based since it prohibits all publications based only on their content. Therefore it is appropriate to utilize the still viable four-part analysis to determine if it is lawful. In doing this, it is clear that it must be struck down.
First, it is obvious that the publication does not advertise illegal acts. Nor is there any allegation that it is misleading. The advertising aspect of the magazine promotes some accred *798 ited courses in a wide variety of academic and life experience subjects. Therefore, even in its commercial aspects, it provides information to the public on the advantages of education and self-improvement.
Certainly the city has a legitimate interest in regulating structures on its public streets. The interest is based on aesthetics, traffic, health, and on safety considerations.
However does the regulation advance that interest? It would appear to do so but with the caveat that to fully attain its goal of freeing the streets of these racks the regulation logically should apply to all such structures, commercial as well as noncommercial. (Metromedia, Inc. v San Diego, 453 US 490 [1981].)
Finally, is the regulation more extensive than necessary to serve the State’s interest? Here, that seems clearly to be the case. The regulation reaches any publication of a commercial nature, and constitutes a complete ban on such communication. By doing so, the city deprives the public of all information relating to the availability of these educational services which they can now obtain by simply picking up the Learning Annex at a publicly placed dispenser.
The city has failed to demonstrate that its interest in cleanliness, aesthetics, health, and safety cannot be achieved by a regulating scheme which rationally limits the number and location of these receptacles rather than totally bans them.
Therefore, on balance, the city has not established interests of sufficient magnitude to override the countervailing interests established by the First Amendment and the public’s right to be informed.
In conclusion, despite my earlier finding that the magazine at issue is noncommercial, if the publication is found to be commercial speech, then the regulation’s suppression is unconstitutional.
The motion for summary judgment by defendants is granted. Plaintiffs’ action is dismissed and defendants’ counterclaims are severed.

. American School Publications is a wholly owned subsidiary of the Learning Annex, Inc.

. The distinction between commercial and noncommercial speech is determined by " 'commonsense’ ” (Central Hudson Gas & Elec. v Public Serv. Commn., 447 US 557, 562 [1980]). This distinction, one commentator notes, has been unreliable in deciding individual cases as "one of the problems with commonsense, as opposed to analytical, distinctions is that they vary enormously with the fact of particular cases” (Tribe, American Constitutional Law, at 896 [2d ed]).

. It should be noted here that the Supreme Court’s recent holding in Board of Trustees v Fox (492 US 469 [1989]), a case heavily relied upon by plaintiff, does not repudiate this holding. The majority opinion states that the "reasonable fit” standard is consistent with Central Hudson’s holding that government restrictions upon commercial speech may be no more broad or no more expansive than necessary to serve its substantial interest.